UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TAMMY COOK**,                                                  Case No. 4:12 CV 858

                    Plaintiff,                              Magistrate Judge James R. Knepp II

          v.                                               MEMORANDUM OPINION AND
                                                           ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

                    Defendant.

### INTRODUCTION

Plaintiff Tammy Cook seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

On January 22, 2008, Plaintiff filed applications for SSI and DIB stating she was disabled due to knee pain, back pain, depression, and bipolar disorder, alleging a disability onset date of October 30, 2001. (Tr. 117, 120, 142). Her claims were denied initially (Tr. 55, 58) and on reconsideration (Tr. 64, 68). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 78). Born July 28, 1973, Plaintiff was 37 years old when the hearing was held on August 17, 2010. (Tr. 25, 30). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 20, 25).

<u>Plaintiff's Reports to the Agency</u>

Plaintiff reported she could only stand for about ten minutes without her legs going numb, further reporting her back cramped if she sat for too long. (Tr. 142). She reported taking several medications to manage her mental impairments, including Abilify, Hydroxyzine, Lamictal, and Depakote. (Tr. 148, 167, 182). At one point she was taking Darvocet for pain management. (Tr. 182).

Plaintiff reported she lived in an apartment with her daughter and son. (Tr. 151). She said a typical day consisted of "[n]ormal daily activities, cooking, some cleaning, personal hygiene" and caring for her children when she was able. (Tr. 153). She explained she could cook meals for herself and her children, though she usually prepared something simple so her daughter could help. (Tr. 153–54). Additionally, Plaintiff stated she spent about an hour per day performing household chores such as simple cleaning and laundry, with her daughter's help. (Tr. 153, 155). Plaintiff reported she could no longer work, play sports, do housework, exercise, or play with her children. (Tr. 153). Additionally, she described difficulty sleeping due to leg pain, nightmares about her children dying, and some difficulties with personal care due to difficulty bending her knees and standing. (Tr. 153–54).

Plaintiff said she did not have a valid license and relied on others to drive her places, explaining she could shop for groceries using a motorized cart. (Tr. 155). She further stated she had no difficulty managing money. (Tr. 156). Plaintiff also said she played games and watched movies with her children. (Tr. 156). She reported spending time with others by visiting, speaking on the phone, playing cards, and going to some social functions. (Tr. 156). She said she went to counseling and doctor appointments several times a month. (Tr. 156).

2

Plaintiff indicated she had difficulty with a number of physical and mental abilities, but did not indicate difficulty understanding, following instructions, or completing tasks. (Tr. 157). She said she could pay attention for "a long span" and got along somewhat with authority figures. (Tr. 157). She also said she used knee braces all day every day. (Tr. 158). In a later report, Plaintiff said she was even more physically limited, explaining she was close to having to use a wheelchair and total knee replacement was her only option, but her doctors advised against it because of her age. (Tr. 168). Plaintiff then tore her ACL and indicated she needed a total knee replacement. (Tr. 180).

In November 2008, Plaintiff said she might need to have surgery on her neck because of right arm numbness and shocks. (Tr. 171). Plaintiff reported her children helped with cleaning, but she often flew into a rage if she thought the house was not clean enough. (Tr. 172–73). Plaintiff was cooperative, but it was difficult to get specific answers from her because she was vague. (Tr. 173). An SSA record from January 2009 indicated Plaintiff had been charged with menacing and ordered to attend counseling. (Tr. 174). There were also indications Plaintiff had difficulties with alcohol and other substance use. (Tr. 174).

Vocational History

Plaintiff completed tenth grade and had no other formal training or education. (Tr. 30–31). She last worked as a cashier at Kentucky Fried Chicken (KFC), a job she held for approximately three weeks before being fired because she could not get along with customers. (Tr. 31). Plaintiff also worked at Roto Rooter as a plumbing dispatcher but lost her job when the company went out of business. (Tr. 32). Additionally, she previously held jobs at McDonald's, Burger King, and Dairy Queen. (Tr. 35). She was fired from one of those jobs because she threw food at a customer. (Tr. 35).

3

<u>Medical History</u>

*Physical Impairments*

On September 15, 2001, Plaintiff went to the emergency room after sustaining a left knee injury during a baseball game. (Tr. 191–92, 196). Plaintiff was in significant pain with swelling, but x-rays did not indicate any bone, soft tissue, or joint abnormality. (Tr. 196, 198). Her ankle and knee were immobilized with splints, and she was given crutches and pain medication. (Tr. 191, 199). The final diagnoses were a medial ligamentous injury to her left knee and a left ankle sprain. (Tr. 197). Plaintiff was discharged with instructions to follow up with an orthopedic surgeon early the next week. (Tr. 196). No record suggested Plaintiff followed this instruction.

On May 10, 2004, Plaintiff went to the hospital complaining of left ankle and knee pain after she tripped and fell. (Tr. 306).  Her left ankle and foot were tender and swollen, but x-rays showed no acute abnormality. (Tr. 308, 310).  Plaintiff was treated with a wrap and pain medication and given crutches. (Tr. 306). She was diagnosed with a sprain and instructed to follow up with a physician, but again, no record indicated she followed up as instructed. (Tr. 308, 312).

In July 2004, Plaintiff sustained a skull fracture after being thrown from a car. (Tr. 241). A CT scan of her cervical spine showed a nondisplaced occipital bone fracture, but no acute intracranial pathology. (Tr. 247, 252–53). Examination showed mild straightening of the cervical spine, but no fractures or subluxations to the bottom of C7 and unremarkable prevertebral soft tissue. (Tr. 249). Thoracic spine x-rays showed mild degenerative changes. (Tr. 250). Lumbar spine x-rays showed no definite acute fracture and unremarkable paraspinal soft tissues. (Tr. 251). She complained of head and neck pains several days after the accident, at which time she was appropriately oriented, with an appropriate affect. (Tr. 241). Plaintiff had some paravertebral

4

tenderness in her neck, but her spinous processes were aligned and she had no cervical spine tenderness. (Tr. 241). She had no tenderness or swelling in her extremities and a normal, painless range of motion. (Tr. 242). Her motor function was normal, and she had no cranial nerve abnormality. (Tr. 242).

In November 2004, Plaintiff injured her left knee, but x-rays showed no acute abnormality. (Tr. 299, 304). She was treated with pain medication, given a knee immobilizer and crutches, diagnosed with a knee contusion and sprain, and discharged with instructions to follow up with Dr. Stanich. (Tr. 299, 301, 303). As usual, there was no record of a follow-up with Dr. Stanich.

On June 6, 2005, Plaintiff presented to the Northside Medical Center after twisting her right ankle. (Tr. 290). X-rays showed no fracture or dislocation, but minimal soft tissue swelling and increased density in the calcaneous. (Tr. 294). She was diagnosed with an ankle sprain, given pain medication and an ankle splint, and instructed to follow up with Dr. Stanich, but the next physical treatment note was dated more than four months later and concerned different complaints. (Tr. 292–93, 297; *see* Tr. 282). Plaintiff sought treatment on October 28, 2005 complaining of right knee pain after being kicked. (Tr. 282). Her knee was swollen and tender, she refused full range of motion testing, and notes described her as dramatic and positive for alcohol. (Tr. 283, 285). An x-ray showed no fracture or dislocation, and Plaintiff was diagnosed with a right knee contusion, given an Ace wrap, and instructed to follow up with Dr. Lockshaw. (Tr. 285, 287–88). Unsurprisingly, there was no follow-up record.

On January 31, 2006, Plaintiff sought emergency treatment following an injury to her right knee. (Tr. 274). Her motor strength was largely normal, but she had right knee swelling, her right knee was very tender, and she was unable to complete the physical examination due to pain. (Tr.

5

275, 277). X-rays showed no fracture or dislocation, but a joint effusion. (Tr. 280). Plaintiff was treated with pain medication and an injection, diagnosed with an acute right knee strain, given crutches, and instructed to follow up with Dr. Stanich, but the record suggested she did not return for physical treatment until the end of 2006. (Tr. 276–77, 279).

On December 18, 2006, Plaintiff went to the hospital complaining of swelling and pain in her right leg since her ACL surgery four days earlier. (Tr. 342–43). Plaintiff's surgical scars were healing and she had only mild swelling consistent with her recent surgery. (Tr. 343). She was instructed to elevate her leg, loosen her Cryo device to avoid any circulation issues, take pain medication, and set up a follow up appointment with Dr. Miniaci. (Tr. 344).  Plaintiff went back to the hospital on December 28, 2006 for physical therapy. (Tr. 347, 349). She reported prior knee surgeries and said her left knee still gave out. (Tr. 256). Plaintiff had an antalgic gait with decreased stance on the right, and she complained of pain during any activities that involved moving her right knee. (Tr. 256). She demonstrated mild patellar restriction and postoperative edema. (Tr. 256). She set therapy goals and was to attend physical therapy two or three times a week, but on February 1, 2007 Plaintiff was discharged from physical therapy because she never returned after her initial evaluation. (Tr. 257, 260).

On January 1, 2007, Plaintiff sought treatment after she fell down the stairs and injured both knees. (Tr. 264). She reported her recent right knee surgery, and her left lower extremity was swollen. (Tr. 267–68). Physical examination revealed somewhat diminished lower extremity strength and swelling. (Tr. 265). A left knee x-ray showed no fracture or dislocation. (Tr. 272). Plaintiff was diagnosed with a left knee contusion, her knee was immobilized, she refused crutches, and she was discharged. (Tr. 266, 268–69). The discharge instructions advised Plaintiff to follow

6

up with a doctor or orthopedic surgeon within two to five days to further evaluate the injury. (Tr. 270–71). On January 26, 2007, Plaintiff saw Dr. Stanich and described her recent knee injury. (Tr. 358). Physical examination revealed minimal to moderate effusion and tenderness over the medial collateral ligament area. (Tr. 358). Dr. Stanich believed Plaintiff had a sprain with a possible interstitial tear of the anterior cruciate ligament. (Tr. 358). He switched her to a different style of knee brace, recommended physical therapy, prescribed pain medication, and noted an MRI would be the next step if Plaintiff did not improve. (Tr. 358).

An MRI of Plaintiff's left knee performed March 6, 2007 revealed evidence of "bony contusion/subcortical compression of the proximal tibia" but no evidence of a complete fracture line or bone fragments. (Tr. 357). There was also a small underlying joint effusion and medial and lateral meniscal dessication without evidence of a complete meniscal tear. (Tr. 357). On December 4, 2007, Dr. Stanich performed surgery to repair a left knee torn lateral meniscus and an interstitial tear of the anterior cruciate ligament. (Tr. 355).

On January 23, 2008, Plaintiff went to the emergency room complaining of knee pain. (Tr. 332, 335). She had a limited range of motion in her knees and joint effusion, but her neurological, psychological, back, and neck examinations were normal. (Tr. 335). X-rays of both knees were negative for fractures. (Tr. 340). She was treated with pain medication, her pain improved, and she was discharged with instructions to keep her appointment with Dr. Stanich the following day. (Tr. 333, 336). Plaintiff saw Dr. Stanich five days later, on January 28, 2008. (Tr. 354). He stated she had periarticular thickness and minimal effusion of her left knee. (Tr. 354). He referred her for three weeks of physical therapy and noted she already had a knee brace, but had not been wearing it at the time of her recent fall. (Tr. 354). In February 2008, Dr. Stanich noted Plaintiff was making progress.

7

(Tr. 353). He prescribed continued physical therapy and a Medrol Dosepak. (Tr. 353). There was no indication Plaintiff attended additional physical therapy.

On October 2, 2008, Dr. David Desantis's x-rays and examination of Plaintiff's cervical spine showed straightening of the normal lordotic curvature, limited range of motion, facet hypertrophy with mild disc space narrowing at C5-6, and no acute or destructive process. (Tr. 420). On October 22, 2008, an abnormal MRI of Plaintiff's cervical spine showed multilevel disc changes and straightening of the normal lordotic curvature. (Tr. 422). On December 17, 2008, after seeing Plaintiff only a few times, Dr. Desantis noted she suffered neck and shoulder pain with some limited range of motion in her neck. (Tr. 419). He said Plaintiff could not perform repetitive tasks or lift items over ten pounds, and when asked about the effects of treatment on Plaintiff's symptoms and her compliance with her prescribed regimen of therapy, he responded "poor". (Tr. 419).

Plaintiff saw Dr. Stanich on May 1, 2009 complaining of knee pain and an MRI showed a complete tear of the anterior cruciate ligament, a small tear of the under-surface of the posterior horn of the medial meniscus, and minimal joint effusion. (Tr. 451). On May 19, 2009, Plaintiff underwent knee surgery to repair the meniscal tear. (Tr. 449). On November 30, 2009, Plaintiff returned to Dr. Stanich, complained of discomfort and swelling in her left knee, and reported a recent episode of her knee giving out. (Tr. 447). X-rays showed no evidence of acute fracture, but minimal osteoarthrosis and moderate narrowing of the medial compartment of the knee, consistent with meniscal pathology. (Tr. 448). Dr. Stanich believed she had a left knee strain and started her on a Medrol Dosepak. (Tr. 447). He instructed her to begin warm soaks and range of motion exercises and planned to see her in two weeks, stating he would administer a cortisone injection if she had not improved. (Tr. 447). Plaintiff missed her follow-up appointment. (Tr. 447).

8

*Mental Impairments*

Plaintiff attended an initial psychiatric evaluation on May 4, 2007 and said she had never been hospitalized for mental health issues or received counseling. (Tr. 322). She exhibited an expansive affect and anxious mood, and she reported agitated depression, aggressive impulsivity, and affective lability. (Tr. 318). Additionally, Plaintiff reported panic attacks, nightmares, and insomnia. (Tr. 318). She reported a history of alcohol and drug abuse but said she had been clean for ten months (though she also said she drank six or seven beers about once a month). (Tr. 318, 320, 322, 326). Plaintiff seemed motivated and discussed mobility concerns related to her knee surgeries. (Tr. 319). She indicated she was an unemployed homemaker and her knees made it difficult for her to work, but she did not check the box saying she was not working due to being disabled. (Tr. 321). She also said "no" when asked if she had any physical or developmental disabilities and reported she wanted to find viable employment that would accommodate her bad knees. (Tr. 319, 329).

Plaintiff's appearance was fair and she presented with braces on each knee. (Tr. 320). The psychiatrist observed Plaintiff was impulsive, with aggressive or violent behavior and a history of violating rules and laws. (Tr. 320). Plaintiff was also sad and irritable and had sleep disturbance issues. (Tr. 320). Plaintiff reported a number of other symptoms of anxiety and mood disturbance, but was cooperative. (Tr. 320). She reported she had attempted suicide six months earlier but denied current suicidal ideation or intent. (Tr. 320). Plaintiff's affect was appropriate, her thoughts were organized and relevant, her insight and judgment were fair, and her memory and concentration appeared to be intact, though Plaintiff reported a decline in short term memory. (Tr. 328). Plaintiff described having severe nightmares about her children, panic attacks, and flying into a rage against her children if they did something wrong. (Tr. 321). She explained she spent time watching movies

9

with her children and also cooked and baked with them. (Tr. 322). Plaintiff was diagnosed with bipolar disorder and an anxiety disorder, not otherwise specified. (Tr. 324). Her Global Assessment of Functioning (GAF) score was 55.[1] (Tr. 324).

On December 11, 2007, Plaintiff was discharged from counseling because she had not returned for treatment. (Tr. 314–15).

On January 30, 2008, plaintiff returned to mental health treatment complaining of bipolar disorder, nightmares, depression, anxiety, panic attacks, and mood swings. (Tr. 365). She noted she had taken Abilify in the past but could not tolerate it and was currently taking Hydroxazene. (Tr. 366). She explained she cared about her children and had good parenting skills. (Tr. 366, 368). Plaintiff was diagnosed with a mood disorder, not otherwise specified and an anxiety disorder, not otherwise specified, and assigned a current GAF of 48.[2] (Tr. 371).

On February 27, 2008, counseling notes indicated Plaintiff reported excessive anger and irritability several times a week and periods of depression lasting up to four days, along with periods of heightened energy. (Tr. 376). She said she usually felt agitated, anxious, and somewhat depressed, and she complained of racing thoughts, severe mood swings, panic attacks, anger outbursts, and periods of blacking out. (Tr. 376). Plaintiff continued to complain of nightmares involving her children and difficulty sleeping. (Tr. 376). She denied psychotic symptoms, suicidality, or homicidality. (Tr. 377). Plaintiff reported her history of substance abuse problems. (Tr. 377). She

---

1. A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).

2. A GAF between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *DSM-IV-TR*, at 34.

was poorly groomed, with a labile and predominantly irritable mood, and it was difficult for her to maintain attention and concentration. (Tr. 378). Her speech was sluggish and she had poor insight and judgment, but her fund of knowledge was adequate. (Tr. 378). Plaintiff was diagnosed with bipolar disorder, type I. (Tr. 378). Her medications were reviewed, and she was instructed to follow up with nurse practitioner Jamie Hain in one month, or sooner if needed. (Tr. 379).

On March 13, 2008, Plaintiff saw Dr. Robert Dunn for therapy. (Tr. 360). She presented as labile with predominant irritability and complained of depression, anxiety, mood instability, anger outbursts, sleep disturbances, nightmares, and panic attacks. (Tr. 360, 362–63). Plaintiff was on probation for disorderly conduct at the time. (Tr. 363). She had good personal hygiene and appearance, and she said she had supportive family members. (Tr. 363–64). She reported difficulties with short-term memory and aggressive behavior, along with a number of mood and anxiety symptoms, but Dr. Dunn observed her to be cooperative and did not observe symptoms. (Tr. 364).

Plaintiff saw Ms. Hain on April 9, 2008 and stated her medications worked "wonderfully." (Tr. 425). She was no longer having nightmares, slept well, and really liked the effect of Depakote. (Tr. 425). She said she was sleeping better but still had scattered thoughts and worried about her children. (Tr. 425). Plaintiff was anxious and fatigued looking, with fair insight, judgment, concentration, and attention. (Tr. 425). Though she did obsess about some things, she was not suicidal, was in no acute psychiatric distress, and denied medication side effects. (Tr. 425). Plaintiff saw Ms. Hain for counseling again on May 7, 2008, reporting she had stopped taking Abilify because it made her nauseous. (Tr. 427). She said her mood had changed after stopping Abilify, but she said Depakote still worked very well and she was sleeping through the night without nightmares. (Tr. 427). She had a blunted mood and affect and some mild restlessness, with reduced attention and

11

concentration. (Tr. 427). Plaintiff returned to Ms. Hain on June 18, 2008 and reported she still had afternoon agitation, anxiety, and irritability. (Tr. 429). She was alert and pleasant, but fatigued-looking with a blunted mood and affect. (Tr. 429). Her attention, concentration, and speech were reduced, and she exhibited some psychomotor guarding. (Tr. 429).

On August 27, 2008, Plaintiff saw Ms. Hain and reported she had started taking Abilify again because she felt too agitated without it and no longer experienced nausea with the medication. (Tr. 430). Plaintiff said her irritability continued to be a problem and she had trouble sleeping without medication. (Tr. 430). She was alert, oriented, fatigued, and anxious, with diminished attention. (Tr. 430). On October 28, 2008, Plaintiff was seen at the counseling center and had a fatigued affect and anxious mood. (Tr. 423). Plaintiff told Dr. Dunn she felt better on her medications and was optimistic about her current romantic relationship. (Tr. 424). She reported a decrease in nightmares and was less depressed. (Tr. 424).

On February 25, 2009, Plaintiff told Ms. Hain she had stopped taking medication when she lost her insurance in November. (Tr. 460). She reported significant symptoms without medication and wanted to resume taking them. (Tr. 460). Plaintiff was limping, stating she had hurt her knee, and she was tearful, depressed, and anxious. (Tr. 460). Her medications were adjusted. (Tr. 460). Plaintiff returned to Ms. Hain on July 15, 2009 – after cancelling or failing to appear at her last four appointments – because she needed a progress letter for her probation officer. (Tr. 458). She said she was angry and easily aggravated, but notes indicated she had not been on medications for approximately two months. (Tr. 458). Plaintiff presented as somewhat irritable, quiet, and withdrawn, with a mildly depressed mood and affect. (Tr. 458). Ms. Hain re-prescribed medications. (Tr. 458).

On June 10, 2010, the Counseling Center closed Plaintiff's file because she had not returned

12

to counseling for almost a year. (Tr. 454).

<u>Opinion Evidence and RFC Assessments</u>

The record contained no opinion evidence from Plaintiff's treating sources, but contained two psychological consultations by examining psychologist Dr. John J. Brescia, a mental RFC assessment by a reviewing psychologist, and a consulting physician's physical RFC assessment.

*Consulting Psychologist Dr. Brescia – Mental RFC Assessments*

At the first evaluation with Dr. Brescia, Plaintiff told him she went to school until tenth grade but did not perform well, left when she became pregnant, and was not able to pass the GED test. (Tr. 381). Plaintiff indicated a history of legal problems, including three DUI arrests and charges for "aggravated menacing, menacing, disorderly conduct, driving under suspension and stuff." (Tr. 381). She was currently on probation for the menacing charge. (Tr. 381). Plaintiff reported she had been diagnosed with "severe bipolar disorder" and was taking Depakote and Abilify. (Tr. 382). She said she was not taking any medications for her knee pain. (Tr. 382). Plaintiff said she had attended counseling in the past but had stopped going because she did not drive and had difficulty getting to appointments. (Tr. 383). She said she had never been hospitalized for psychiatric reasons. (Tr. 383). Plaintiff reported a history of alcohol abuse but said she had not taken a drink for about a year and had not used drugs for three or four years. (Tr. 383). She said she had last worked at KFC but could not get along with people. (Tr. 384). Most of her previous jobs lasted only a few months. (Tr. 384).

Plaintiff was adequately groomed and expressed herself in a lucid and coherent manner. (Tr. 384). She responded appropriately to questions and had no unusual ideation. (Tr. 384). She had an appropriate affect and fair eye contact, with a drawn and uncertain demeanor. (Tr. 384). Plaintiff agreed she had symptoms such as loss of control, anger outbursts, feelings of depression, and crying

13

spells. (Tr. 384–85). She reported difficulty sleeping and nightmares but said Depakote worked very well and helped her sleep fairly well. (Tr. 385). Plaintiff exhibited a somewhat tense and uncertain demeanor, but no motor manifestations or autonomic signs of anxiety. (Tr. 385). She reported feeling tense and anxious and becoming upset with her children over relatively minor issues. (Tr. 385). Plaintiff agreed she had trouble getting along with and relating to others, but could not explain why she had this difficulty. (Tr. 386). She said she became violent and thought of harming others, but there was no indication of delusional thinking or a formal thought disorder. (Tr. 386).

Plaintiff was oriented, with no indication of diminished alertness or clouded consciousness. (Tr. 387). Her responses to questions reflected below average cognitive functioning. (Tr. 387). Plaintiff told Dr. Brescia her two children lived with her and she cleaned all the time, further reporting she watched movies and television with her children and liked to cook and bake. (Tr. 388). She did state her daughter and stepfather helped her with chores. (Tr. 388). She said she grocery shopped using a motorized cart, though her stepfather had to drive her because she was not currently licensed to drive. (Tr. 388). Plaintiff stated she had "maybe five" friends but reportedly never saw them, though she did state she visited with her neighbors. (Tr. 388).

Dr. Brescia concluded Plaintiff exhibited serious symptoms of a mood disorder, moderate underlying personality problems, below average cognitive functioning, and moderate to serious functional impairment. (Tr. 388–89). He diagnosed Plaintiff with a mood disorder, not otherwise specified, nicotine dependence, and a personality disorder, not otherwise specified, and assigned a GAF of 50. (Tr. 389–90). Dr. Brescia found Plaintiff moderately limited her in ability to relate to others, maintain attention, concentration, persistence, and pace to perform routine tasks, and withstand the stress and pressures of daily work. (Tr. 390). He found her mildly to moderately

14

impaired in her ability to understand, remember, and carry out tasks, stating she would have difficulty with more complex or detailed tasks and may occasionally have trouble with multi-step routine tasks, but would be able to perform simple, repetitive tasks. (Tr. 390).

On January 28, 2009, Plaintiff underwent a second psychological consultation with Dr. Brescia. (Tr. 434). She discussed her physical limitations and substance abuse history, reporting she had not consumed alcohol for two or three years and had not used cocaine for at least ten years. (Tr. 436–37). She was cooperative, interacted appropriately, and expressed herself in a lucid and coherent manner. (Tr. 438). She again had an appropriate affect, but a drawn and uncertain demeanor. (Tr. 438). She did not have current suicidal ideation, but was reported crying episodes, guilt, regrets, difficulty sleeping, nightmares, anxiety, panic attacks, and anger outbursts. (Tr. 439). Plaintiff's description of her psychological functioning "came across as generally credible". (Tr. 440). She had no indication of clouded consciousness or diminished alertness, and her responses indicated low-average cognitive functioning. (Tr. 440–41). She reported she could watch television but could not do much more and needed help with all chores. (Tr. 441–42). Plaintiff initially said she had no friends, but then reported talking on the phone with a couple people. (Tr. 442).

Dr. Brescia concluded Plaintiff was exhibiting low-average cognitive functioning with serious symptoms of a mood disorder warranting a GAF score no higher than 50. (Tr. 442). He said she was exhibiting moderate to serious functional impairment. (Tr. 443). Dr. Brescia found Plaintiff moderately impaired in her ability to relate to others, maintain attention, concentration, persistence, and pace to perform routine tasks, and withstand the stress and pressures of day to day work. (Tr. 444). He found her mildly impaired in understanding, remembering, and carrying out tasks, stating she could perform simple repetitive tasks but would have occasional difficulty with more complex

or detailed tasks. (Tr. 444). He ultimately opined she "should be able to handle most familiar routine tasks involving the performance of multiple steps." (Tr. 444).

*Reviewing Physician Dr. David Dietz – Mental RFC Assessment*

Dr. Dietz reviewed Plaintiff's record and completed a mental RFC assessment and psychiatric review technique, finding her moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation of extended duration. (Tr. 402). Dr. Dietz found Plaintiff moderately limited in a number of specific areas, including: understanding, remembering, and carrying out detailed instructions; maintaining concentration for extended periods; working in coordination with or proximity to others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (Tr. 406–07). He found her not significantly limited in all other areas of functioning, including: understanding, remembering, and carrying out very short and simple instructions; performing activities within a schedule; maintaining regular attendance and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately to criticism from supervisors. (Tr. 406–07).

Dr. Dietz noted Plaintiff cared for her two children and spent the day cleaning and watching television. (Tr. 408). He stated she appeared mostly credible and gave weight to Dr. Brescia's opinion, noting Plaintiff would "do best with routine tasks that do not involve strict production

16

standards or rigid time constraints and that require only superficial interpersonal contact." (Tr. 408).

*Reviewing Physician Dr. Gary Demuth – Physical RFC Assessment*

Dr. Demuth assessed Plaintiff's physical RFC and found she could lift 25 pounds frequently and 50 pounds occasionally and stand, walk, or sit for about six hours in an eight-hour workday. (Tr. 411). He found her unlimited in pushing and pulling. (Tr. 411). Dr. Demuth noted Plaintiff's knees were non-severe at her date last insured and her recent medical evidence showed no complaints or treatment for back pain. (Tr. 411). He found she could frequently balance and climb ramps and stairs, could occasionally kneel, crouch, and crawl, and could never climb ladders, ropes, or scaffolds. (Tr. 412). Additionally, Dr. Demuth found Plaintiff should avoid concentrated exposure to hazards such as heights and machinery, due to her knee pain. (Tr. 414). He found Plaintiff's symptoms were attributable to a medically determinable impairment, but stated her allegations were only partially credible, and he suggested her RFC would improve in the future. (Tr. 415).

<u>ALJ Hearing</u>

Plaintiff testified about her history of short-term jobs and difficulty getting along with coworkers and the public prior to starting psychiatric medication. (Tr. 31–36). She said she had undergone eight surgeries on her left knee and two on her right knee. (Tr. 36–37). Plaintiff stated she wore knee braces daily but still fell down every day due to her knees giving out. (Tr. 38–39). She also testified about knee pain, leg numbness, back pain, and difficulty performing daily tasks alone. (Tr. 42–45). Additionally, Plaintiff described days of depression, difficulty sleeping, nightmares, and panic attacks. (Tr. 40–42). She testified Depakote helped with her nightmares. (Tr. 41–42).

The ALJ asked the VE to consider a hypothetical person of Plaintiff's age and vocational background, with the following restrictions:

[She] would be able to perform a range of light work; would require a sit/stand option, could perform postural movements occasionally except should not kneel, crawl or climb ladders, ropes or scaffolds. Should do no push/pull maneuvers with the lower extremities. Should, to the maximum extent possible, do all walking on level and even and non-slippery surfaces. Should not be exposed to temperature extremes or wet or humid conditions or hazards. Should work in a low-stress environment, with no production line or assembly-line-type pace, and no independent decision making responsibilities. Would be limited to unskilled work involving only routine and repetitive instructions and tasks. Should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors.

(Tr. 47). The VE testified a person with that RFC would be best suited for sedentary work, and identified a number of positions existing in significant numbers in the national economy such a person could perform. (Tr. 47–48). Responding to Plaintiff's attorney, the VE testified no work would be available if in addition to the ALJ's posed restrictions, the person was moderately impaired in concentration, persistence, pace, and withstanding the stress and pressure of daily work, defining "moderately impaired" as being off task more than ten percent of the time. (Tr. 48–49). Using that definition, the person would also be unable to work if there was an additional moderate impairment in social functioning and activities of daily living. (Tr. 49).

ALJ Decision

The ALJ found Plaintiff's date last insured was June 30, 2006. (Tr. 11). He found Plaintiff suffered a number of severe impairments – including a history of multiple sprains, strains, and internal derangement to her bilateral knees, status post-arthroscopic surgery; degenerative disc disease/degenerative arthritis of the cervical spine; bipolar disorder; anxiety disorder, not otherwise specified; and personality disorder, not otherwise specified – but none of these impairments, either alone or in combination, met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11). With regard to physical impairments, the ALJ determined Plaintiff's back and

18

knee impairments did not result in an inability to ambulate effectively as defined in 1.00B2b. (Tr. 12). After summarizing Plaintiff's consultative psychological evaluation, the ALJ found Plaintiff mildly limited in activities of daily living, moderately limited in social functioning, and moderately limited in concentration, persistence, and pace, with no episodes of decompensation of extended duration. (Tr. 12). After considering the record, the ALJ assessed the following RFC for Plaintiff:

> [She can] perform a range of sedentary work . . . but requires a sit/stand option; can perform postural movements occasionally, except cannot kneel[,] crawl[,] or climb ladders, ropes, or scaffolds; should have no exposure to temperature extremes, wet/humid conditions or hazards; should work in a low stress environment with no production line or assembly line type of pace and no independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; should have no interaction with the general public; and should have no more than occasional interaction with co-workers and supervisors.

(Tr. 13).

Explaining his RFC determination, the ALJ extensively summarized Plaintiff's treatment records – including many instances of treatment non-compliance or failure to continue treatment – her consultative evaluations, and her testimony, finding Plaintiff's complaints not credible for a variety of reasons. (*See* Tr. 13–19). Considering Dr. Brescia's consultative examination, the ALJ determined those reports did not indicate Plaintiff was precluded from all work. (Tr. 18). Specifically, he found Dr. Brescia's limitations consistent with Plaintiff's RFC, and he assigned little weight to the GAF scores Dr. Brescia assessed for Plaintiff because they were largely based on Plaintiff's subjective reports. (Tr. 18). He gave great weight to the state agency consultant opinions regarding Plaintiff's mental limitations and rejected the physical consultant's opinion that she could perform medium work, as the ALJ determined the evidence showed she was more limited. (Tr. 18–19). In fact, he gave her the benefit of the doubt and limited her to sedentary work, although the possibility remained she could actually perform light work. (Tr. 19).

19

The ALJ found Plaintiff could not perform any past relevant work. (Tr. 19). Based on VE testimony, he found Plaintiff could perform jobs existing in significant numbers in the national economy. (Tr. 19–20). Thus, the ALJ found Plaintiff not disabled. (Tr. 20). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

20

C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step

evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was the claimant engaged in a substantial gainful activity?
>
> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can she perform past relevant work?
>
> 5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one

through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to

establish whether the claimant has the residual functional capacity to perform available work in the

national economy. *Id.* The court considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* A

claimant is only determined to be disabled if she satisfies each element of the analysis, including

inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) &

416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in his evaluation of opinion evidence, specifically arguing he

did not properly evaluate Dr. Brescia's opinion. (Doc. 15, at 14–16). Plaintiff additionally argues

the ALJ erred in assessing her credibility. (Doc. 15, at 16–20).

<u>Evaluation of Consulting Psychiatrist Opinion</u>

Plaintiff contends the ALJ erred because he assigned little weight to Dr. Brescia's GAF scores – which indicated serious symptoms – and did not properly consider Dr. Brescia's opinion of Plaintiff's psychological limitations. (Doc. 15, at 15). She notes Dr. Brescia concluded Plaintiff would be moderately impaired in maintaining attention, concentration, persistence, and pace to perform routine tasks, arguing the ALJ nevertheless improperly concluded she could perform routine and repetitive tasks. (Doc. 15, at 15). Plaintiff is mistaken.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). But Plaintiff's record did not contain any treating physician opinions. Rather, she argues the ALJ's RFC assessment is inconsistent with examining psychologist Dr. Brescia's consultative opinion. Generally, more weight is given to a source that has examined a plaintiff than to a source who has not examined her. 20 C.F.R. § 404.1527(c)(1). In determining how much weight to afford a particular opinion, an ALJ must consider the following additional factors: treatment relationship – length, frequency, nature and extent; supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; consistency of the opinion with the record as a whole; and specialization. 20 C.F.R. § 404.1527(c)(2)–(5).

As Defendant points out, the ALJ's RFC assessment is actually consistent with Dr. Brescia's opinion. (*See* Doc. 16, at 13). Dr. Brescia opined Plaintiff was moderately limited in her ability to relate to others; maintain attention, concentration, persistence, and pace to perform routine tasks; and withstand the stress and pressure of daily work. (Tr. 390, 444). He found her either mildly or

22

mildly to moderately impaired in understanding, remembering, and carrying out tasks. (Tr. 390, 444). At his most recent evaluation, he stated she could perform simple repetitive tasks and "should be able to handle most familiar routine tasks involving the performance of multiple steps." (Tr. 444).

Accommodating Plaintiff's moderate difficulties maintaining social functioning, the ALJ limited her to no more than occasional interaction with supervisors and co-workers, and no interaction with the general public. (Tr. 13). Accommodating Plaintiff's moderate difficulties maintaining concentration, persistence, and pace, the ALJ found Plaintiff should perform only unskilled work involving only routine and repetitive instructions and tasks. (Tr. 13). And accommodating Plaintiff's moderate difficulties withstanding stress and pressure at work, the ALJ determined she should work in a low-stress environment, with no production line or assembly line work, and no independent decision-making responsibilities. (Tr. 13). These restrictions also take into account Plaintiff's mild or mild-to-moderate difficulties understanding, remembering, or carrying out tasks and are consistent with Dr. Brescia's finding that Plaintiff should be able to perform "most familiar routine tasks involving the performance of multiple steps", along with his finding that she can perform simple repetitive tasks. (Tr. 390, 444). Therefore, it appears the ALJ gave weight to Dr. Brescia's opinion, and he explicitly noted Dr. Brescia's opinion did not indicate all work was precluded. (Tr. 18). Indeed, the ALJ could not have said Dr. Brescia's opinion precluded Plaintiff from all work, because Dr. Brescia listed types of work she could perform. (Tr. 390, 444).

Plaintiff argues the VE testified all work would be precluded if she were moderately limited in concentration, persistence, and pace, but this does not accurately portray the testimony. (Doc. 15, at 15). The ALJ's hypothetical person was limited to a low-stress environment, no independent decision-making responsibilities, unskilled work involving only routine and repetitive tasks, and

23

social restrictions – the same as the RFC the ALJ ultimately determined for Plaintiff. (Tr. 13, 47). The ALJ concluded these restrictions accounted for Plaintiff's moderate impairments in concentration, persistence, and pace, and the VE testified such a person could perform multiple jobs at the sedentary exertional level. (Tr. 12, 47–48). Plaintiff's counsel asked the VE to respond to a hypothetical person and explicitly defined "moderately impaired" as not being able to function more than ten percent of the time, and the VE and ALJ both acknowledged work would be precluded if a person was off task in any ability more than ten percent of the time. (Tr. 48–49). Though Plaintiff argues "[t]he VE testimony relied upon by the ALJ did not reflect a limitation on routine tasks", the ALJ's hypothetical person was expressly limited to "unskilled work involving only routine and repetitive instructions and tasks." (Doc. 15, at 15); (Tr. 47). As already described, this hypothetical – and therefore the RFC – account for the same limitations Dr. Brescia assigned to Plaintiff.

Further, the record supports the finding that Plaintiff can perform work with the mental limitations the ALJ assessed. Plaintiff did not consistently treat her mental health conditions – resulting in being discharged twice for noncompliance – and at least part of the time it appears she was in counseling due to a court order. (*See, e.g.,* Tr. 174, 314–15, 318–29, 365, 424, 454, 458, 460). After abandoning treatment once before, Plaintiff returned after missing four appointments, asked for a progress letter to give her probation officer, and never returned to treatment. (Tr. 454, 458, 460). When Plaintiff did attend her counseling appointments, she consistently reported her medications worked "wonderfully", she "really liked" their effects, and she felt better on medications. (Tr. 424–25, 427). She was optimistic, had fewer nightmares, could sleep through the night, and felt less depressed. (Tr. 424). Additionally, records suggested Plaintiff was cooperative (Tr. 173, 212, 223, 231, 307, 320, 364, 438), expressed herself lucidly and coherently (Tr. 384, 438),

24

had intact concentration with organized and relevant thought content (Tr. 328), and several evaluations showed no indication of diminished alertness (Tr. 387, 440).

At her initial psychiatric evaluation, Plaintiff did not appear to believe she was disabled by her mental condition because she reported she wanted to find viable employment to accommodate her bad knees. (Tr. 319). She was the sole caretaker for her two children and reported her typical day consisted of normal daily activities such as cooking, cleaning, watching movies, playing games with her children, or baking. (Tr. 153–54, 156, 322, 366, 388). Plaintiff's initial reports also failed to indicate difficulty understanding, following instructions, or completing tasks, and she said she could pay attention for "a long span". (Tr. 157). All this evidence more than provides substantial evidence supporting the ALJ's conclusions regarding Plaintiff's mental RFC, and that RFC is consistent with Dr. Brescia's ultimate conclusion that Plaintiff could perform simple repetitive tasks and should be able to handle most familiar routine tasks involving multiple steps.

Plaintiff argues the ALJ erred by giving little weight to Dr. Brescia's assigned GAF score of 50. (Doc. 15, at 16). A GAF score of 50 suggests serious symptoms or any serious impairment in social, occupational, or school functioning. *DSM-IV-TR*, at 34. But although he assigned Plaintiff a GAF score indicating serious symptoms or impairment, Dr. Brescia's more detailed conclusions assessed Plaintiff as having only moderate limitations and found she was still able to perform some work activity. (Tr. 390, 444). The ALJ did not err by giving the GAF scores limited weight where Dr. Brescia saw Plaintiff only twice, where his "serious" GAF scores did not match his conclusions that Plaintiff was only moderately impaired and could perform some tasks, where the record is consistent with moderate impairments rather than serious ones, and where at least one of the GAF scores was assigned when Plaintiff had not been on her medications for several months. (*See* Tr.

442, 460). Accordingly, substantial evidence supports the ALJ's conclusions and he did not err in assessing opinion evidence.

<u>Credibility Analysis</u>

Plaintiff also argues the ALJ improperly assessed her credibility, drawing attention to Plaintiff's numerous surgeries and trips to the emergency room for her physical conditions, and suggesting her erratic mental health treatment was "more a symptom of her bipolar disorder than a reason that she lacked credibility." (Doc. 15, at 19). Overall, she alleges the ALJ's reasoning was not sufficiently clear for subsequent reviewers. (Doc. 15, at 19–20).

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;

26

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Here, after extensively summarizing Plaintiff's treatment record, testimony, opinion evidence, and other reports, the ALJ found Plaintiff not entirely credible because she took no pain medication for her reportedly debilitating back and knee pain, reported a number of knee surgeries inconsistent with the evidence from the record, and historically failed to continue mental health treatment or physical therapy. (Tr. 11–19). Substantial evidence supports this decision despite Plaintiff's complaints about the ALJ's findings. As to Plaintiff's issue with the ALJ's focus on her lack of pain medication, the ALJ's observation was valid. In fact, Plaintiff never even stated she was taking over the counter medications to manage her pain. Moreover, her treatment history contained more to discredit her than her lack of pain medication: Plaintiff repeatedly failed to follow up with physicians regarding her knee conditions (*see, e.g.,* Tr. 196, 274, 282, 288, 297, 303, 342, 312, 447);

27

she never returned for any physical therapy after her initial evaluation (Tr. 257, 260); she did not always wear her knee braces (Tr. 158, 354); she was discharged twice from counseling because she failed to return to treatment and missed multiple appointments during treatment (Tr. 314–15, 454, 458); and she consistently said medication improved her mental health conditions (Tr. 424–25, 427).

Plaintiff also takes issue with the ALJ's statement regarding the number of surgeries she had on her knees. (Doc. 15, at 19). Plaintiff testified she had ten total surgeries on her knees (Tr. 36–37), but the transcript refers to far fewer and at least one of the reported surgeries was supported only by Plaintiff's statement to her physical therapist (Tr. 256, 343, 355, 449), so the ALJ did not err by referring to this inconsistency. Additionally, Plaintiff's daily activities also show she could do more than someone completely disabled, as she reported multiple times that she was the sole caretaker of her two children, enjoyed cooking and baking, cleaned, did laundry, and took pride in her parenting skills. (Tr. 153–54, 156, 322, 366, 368, 388). By accurately reciting Plaintiff's medical history and other evidence and evaluating several factors from SSR 96-7p – namely, her medication use or lack thereof, other treatment, daily activities, and inconsistencies – the ALJ properly assessed Plaintiff's credibility, and substantial evidence supports his conclusion that she was not entirely credible.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

　　　　s/James R. Knepp, II
United States Magistrate Judge